IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DEBORAH L. PARKER,** | CIV F 06-654 AWI DLB |
| Plaintiff, | ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| **FIDELITY SECURITY LIFE INSURANCE CO.**, a corporation, DOE 1, DOE 2, DOE 3, DOE 4 and DOES 5-100, inclusive, | |
| Defendants. | |

  This case stems from the denial of monetary benefits under an accidental death and dismemberment insurance policy. The beneficiary of the policy, Deborah Parker ("Parker"), originally brought suit against Doe defendants and Fidelity Security Life Insurance Co. ("FSI") in state court and alleged three causes of action: (1) breach of contract, (2) breach of the duty of good faith and fair dealing, and (3) failure to investigate. FSI later removed to this Court. This Court granted in part and denied in part FSI's Rule 12(b)(6) motion with leave to amend and characterized the third cause of action as a method of showing a breach of the duty of good faith and fair dealing. Parker filed no new complaint. FSI now moves for summary judgment. For the reasons that follow, FSI's motion will be granted.

**FACTS**

FSI issued to Richard Parker ("Decedent") and Deborah Parker a policy of accidental death and dismemberment insurance with an effective date of April 1, 2003 ("the Policy"). DUMF No. 3.[1] Subject to its terms, conditions, definitions and exclusions, the Policy included death and dismemberment coverage up to a maximum of $273,000. Id. The Policy contained the following pertinent language:

> If the Insured Person, as a result of injury, shall accidentally sustain, directly and independently of all other causes, any of the losses described below within ninety (90) days of such injury, the Company will pay the amount specified for such loss.
>
> For Loss of . . . Life
> . . .
>
> EXCLUSIONS
>
> We will not pay benefits for a loss caused or contributed by:
>
> (a) Suicide, or any attempt thereat, while sane, or
> . . .
>
> (c) Drugs voluntarily taken, except those prescribed by a doctor . . . .

Id.

Decedent was admitted to Oak Valley Hospital at approximately 10:50 p.m. on April 8, 2004. DUMF No. 25. At 6:25 a.m. the following day, Decedent was admitted to the intensive care unit after undergoing an operation to relieve pressure in his abdomen. DUMF No. 26. At 10:10 a.m. on April 9, 2004, Decedent was removed from a ventilator per his doctor's order which was obtained after consultation with Parker. DUMF No. 27. At 10:15 a.m., Decedent was pronounced dead by his treating physician. DUMF No. 28.

Through a letter sent by her attorney and dated May 18, 2004, Parker submitted a claim to FSI for benefits under the Policy; Parker stated that Decedent died as a result of "drug and ethanol toxicity/med. malpractice." See DUMF Nos. 4-5; Warren Declaration Exhibit B. In support of

---

[1] "DUMF" refers to Defendant's Undisputed Material Facts.

the claim, Parker submitted a Proof of Death form, a certified Death Certificate, the Stanislaus County Coroner's autopsy report pertaining to Decedent, and a copy of the original Policy. DUMF Nos. 6-9.

On December 10, 2004, FSI denied Parker's claim and explained the basis of the decision as:

> The copy of the death certificate indicates the Cause of Death as 'Pending Tox' and the Manner of Death is indicated as 'Pending Investigation.' The Coroner's report indicates, 'Acute combined drug and ethanol toxicity with other significant conditions: Cardimegaly with left Ventricular Hypertrophy.' Information from Oak Valley Ambulance indicates, 'Patient left a note stating his intentions to die,' and Oak Valley Hospital records indicate the final diagnosis as 'Attempted suicide and overdose.'

DUMF No. 10; Warren Declaration Exhibit G. FSI invited Parker to provide an original death certificate "which indicates the Cause and Manner of Death" as well as the opportunity to have the decision reviewed. DUMF No. 11. FSI required that a request for review be in writing and "state the reason(s) you feel the claim should be favorably considered." Id.

Decedent's medical records indicated that the cause of his death was suicide by means of drug and alcohol toxicity, also referred to as an overdose. DUMF No. 12. The medical records also indicated that the Decedent had a history of "severe depression." See Warren Declaration Exhibits I; Warren Declaration Exhibit J.

The Coroner's report indicated that Decedent's death had been submitted to the Coroner to "Rule out overdose." See DUMF No. 18; Exhibit O. The Coroner's report stated in part: "At the residence the decedent was talking with medical personnel, and stated that he had been drinking beer and whiskey, and had taken approximately 15 pills. He stated to paramedics that he just wanted to go to sleep and not wake up. A suicide note was found at the residence concerning cremation and who to contact." DUMF No. 19. Decedent's Death Certificate was updated after the toxicology investigation was completed and was accepted for registration on May 20, 2004. See DUMF No. 17; Exhibit N. The Coroner's final conclusion was that Decedent's "Immediate Cause" of death was "Suicide . . . Ingested enough prescription medication and alcohol to cause

death." Id.

At some point, Parker had Dr. Brandon Boggs, an emergency room physician, review Decedent's medical records in connection with her claim and this litigation. See Warren Declaration Exhibit J ("Boggs Report"). Dr. Boggs formed an opinion that Decedent did not commit suicide. Dr. Boggs's opinion was purportedly based in part on an analysis of the number of pills prescribed, compared to the number of pills missing form the bottles found after Decedent was taken to the hospital. See DUMF No. 13. Dr. Boggs's report is unsworn and states in relevant part:

> . . . it is solely my opinion that there are major discrepancies in the presumed diagnosis of intentional drug ingestion and suicide attempt. These discrepancies are as follows: (1) The alleged ingestion of 6 Darvocet with a prescription filled 8 days prior to this for a total of 60 with one every eight hours as the prescribed dose and a toal of 14 missing after 8 days of use, which if being used prescribed could have shown 24 missing is used to the maximum dosing as allowed by his primary physician. Less pills missing than the prescribed rather than more pills missing is not consistent with intentional overdose. (2) The alleged 22 Xanax pills of 1 mg each with toxicity level of .11 mg/l with the proper level of therapeutic range being .10 mg/l, showing that the ingestion of 22 pills to be very unlikely. This combined with a prescription filled 8 days prior for 120 pills with 105 remaining in the bottle and prescribed to take three times a day would total 24 pills used, not 15. Once again, less pills used than prescribed instead of more than prescribed is not consistent with intentional overdose. (3) The alleged 6 Darvocet 100 taken which contain 100mg of propoxyphene and 650 mg of Tylenol with a toxicology level of .19 mg/l, .16 mg/l for norpropoxyphen, a three hour Tylenol level of 53 mg/l and subsequent decreased levels thereafter showing this to be the peak level. These levels correlate to the effective range of propoxyphene and norpropoxyphene, not toxic levels and the Tylenol level is not consistent with a toxic level ingestion of Darvocet as the source of the Tylenol. (4) The alleged unknown amount of Paxil ingested with a level of .11 with .10 being at the bottom of the potentially toxic range.[2] (5) The coroner's report stating that no pill fragments were found in the gastrointestinal tract but that the charcoal which was administered by the hospital staff approximately 2 hours after the ingestion was present, is inconsistent with the ingestion of the alleged 28+ pills. (6) The alcohol level of .22 mg/l in a known patient that uses alcohol daily according to the primary physician's history and physical is consistent with the possibility and not an acute ingestion for the purpose of suicide. As a result of the preceding discrepancies and evidence, it is my opinion that this patient most likely died of the combined effects of Xanax, Darvocet, and alcohol with the evidence pointing toward poor decision making by a depressed patient in that he chose to drink alcohol and take his regular meds as prescribed and not an intentional overdose and suicide attempt by taking more

---

[2] However, earlier in the report, Boggs states that the toxicology report indicated that the Paxil level was .14 mg/l. See Warren Declaration Exhibit J at p. 60.

medicine than he was prescribed.

Boggs Report at 60; see also DUMF No. 13.

The figures of 22 tablets of Xanax and 6 tablets of Darvocet appear to come from the medical records in the "Prehospital Report" and the "Oak Valley Hospital Emergency Physician Record, Ingestion/Swallowed Foreign Body" form. See Warren Declaration Exhibit I at p. 38-39; see also Boggs Report at p. 59. The "Prehospital Report" form indicates in the call summary section:

> PT took possibly 22 Xanax, 6 Darvocet, and an unknown amount of Paxil tablets of unknown strengths, with alcohol and sat in chair where he went to sleep. PT left a note stating his intentions to die. Upon arrival found PT out on patio, conscious alert but obviously intoxicated with alcohol. PT does not denies [sic] taking the medications. PT at first did not want treatment but sheriff deputy placed him under 5150 hold.

Warren Declaration Exhibit I at p. 38; see also Boggs Report at 59.

Parker's attorney wrote to the Coroner on March 30, 2005, and requested that Decedent's cause of death be changed from suicidal to accidental based on Dr. Boggs's report and conclusions. See DUMF No. 16; Warren Declaration Exhibit M. It does not appear that the requested changes were made by the Coroner or that the Coroner's conclusions have changed.

In response to interrogatories, Parker stated, "While at the hospital, intubation was attempted on numerous occasions by the attending emergency room physician. In the process of doing so, the intubation was placed into the stomach of Richard Parker, thereby plugging the airway causing suffocation which was the cause of his accidental death." DUMF No. 20. Parker's only support for her contention that Decedent died as a result of medical malpractice, other than what her lawyer told her, was "[b]y his appearance after I returned to the hospital and by reading the ER report." DUMF No. 21. Despite her alleged medical malpractice claim, Parker has never spoken to anyone at the hospital about the cause of Decedent's death. DUMF No. 22. Parker has never filed a claim against the hospital or any of the doctors that treated Decedent on the night of the incident. DUMF No. 23. Parker's own medical expert, Dr. Boggs, reached the conclusion that Decedent had "most likely died of the combined effects of Xanax, Darvocet, and

that he chose to drink alcohol and take his regular meds as prescribed," and never mentioned any act or omission that indicates that medical malpractice contributed to or caused Decedent's death. DUMF No. 24.  Also, Parker testified that Decedent regularly took either too much or too little of his medication, and that it was difficult to keep him on his prescribed level of medication.  DUMF No. 14.  Parker testified that she had no idea how much medication Decedent had taken in the twelve hours prior to her call for help to 911.  DUMF No. 15.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to undisputed facts, it is a mixed question of law and fact.  See Sousa v.Unilab Corp. Class II (Non-Exempt) Members Group Benefit Plan, 252 F. Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the case turns on a mixed question of law and fact and the only dispute relates to the legal significance of the undisputed facts, the controversy for trial collapses into a question of law that is appropriate for disposition on summary judgment.  See Union Sch. Dist. v. Smith, 15 F.3d 1519, 1523 (9th Cir. 1994); Sousa, 252 F.Supp.2d at 1049.

> A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000). If the moving party meets it initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine Ins., 210 F.3d at 1103; Nolan v. Cleland, 686 F.2d 806, 812 (9th Cir. 1982); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002). A "genuine issue of material fact" arises when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson, 477 U.S. at 248-49; Thrifty Oil, 322 F.3d at 1046.

In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Willis v. Pacific Maritime Ass'n, 244 F.3d 675, 682 (9th Cir. 2001). However, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; Hopper v. City

7

of Pasco, 248 F.3d 1067, 1087 (9th Cir. 2001).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587; Mende v. Dun & Bradstreet, Inc., 670 F.2d 129, 132 (9th Cir. 1982).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  See Rule 56(c); Fortyune, 364 F.3d at 1079-80.  The court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references.  See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Mayweathers v. Terhune, 328 F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because a litigant claims that one exist or promises to produce admissible evidence at trial."  Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see also Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  "A motion for summary judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not

significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. See Nissan Fire & Marine, 210 F.3d at 1103.

**1.    BREACH OF CONTRACT CLAIM**

*Defendant's Arguments*

FSI argues that the materials submitted by Parker indicated that Decedent's death was a suicide due to toxicity from medication and alcohol. The medical records have a final diagnosis of suicide, the final Coroner's report and death certificate indicate suicide, and documentation from the Coroner shows that a suicide note was found, Decedent said he took about 15 pills, and that he did not want to wake up. Boggs's opinion is unreliable because it is based primarily on comparing the left over tablets with the number that should be missing if Decedent had been taking the medications as described. However, Parker herself testified that it was very difficult to keep Decedent on his medication and that he did not regularly take his medication. Finally, Parker's claim that the Decedent died from medical malpractice has no support. There have been no medical opinions offered by Dr. Boggs or any other physician that Decedent received negligent care. Parker has not spoke to anyone about malpractice or filed suit against any of the responsible health care providers. In short, the evidence shows that Decedent committed suicide and not accidental, did not die from medical malpractice, and the death was not covered by the policy.

*Plaintiff's Opposition*

Parker has filed no opposition or response of any kind.

*Legal Standard*

In first party insurance cases, the claimant or insured has the burden of establishing that the occurrence forming the basis of her claim is within the basic scope of insurance coverage. MacKinnon v. Truck Ins. Exchange, 31 Cal.4th 635, 648 (2003); Aydin Corp. v. First State Ins. Co., 18 Cal.4th 1183, 1188 (1998). Once this showing has been made, the burden then shifts to

the insurer to prove that the claim is specifically excluded. MacKinnon, 31 Cal.4th at 648; Aydin, 18 Cal.4th at 1188; Searle v. Allstate Life Ins. Co., 38 Cal.3d 425, 437-38 (1985). Insurance coverage clauses are "interpreted broadly so as to afford the greatest possible protection to the insured," but "exclusionary clauses are interpreted narrowly against the insurer." TRB Investments, Inc. v. Fireman's Fund Ins. Co., 40 Cal.4th 19, 27 (2006); MacKinnon, 31 Cal.4th at 648.

Generally, in cases involving life insurance polices that cover the death of an insured, the burden of relying on a suicide exclusion and proving suicide rests on the insurer. See Searle, 38 Cal.3d at 438. This burden "requires more than proof of the act of self-destruction, the proof must further establish that the act was committed with suicidal intent, i.e., the purposeful or intentional causing of death." Id. at 437. However, in cases involving accident insurance policies where coverage is provided for "accidental injury" or "accidental death," the claimant bears the burden of establishing that the injury or death was accidental.[3] See Zuckerman v. Underwriters at Lloyd's, 42 Cal.2d 460, 472-74 (1954); Blake v. Aetna Life Ins. Co., 99 Cal.App.3d 901, 923-24 (1979); White v. Aetna Life Ins. Co., 198 Cal.App.2d 370, 376-77 (1961); see also Clemmer v. Hartford Ins. Co., 22 Cal.3d 865, 880 (1978). The term "accident" has been defined as "a casualty -- something out of the usual course of events and which happens suddenly and unexpectedly and without any design of the person injured." Zuckerman, 42 Cal.2d at 473. "Death by suicide reasonably may be said to have been caused by 'intentional self-injury,'" and "'intentional self-injury' . . . is the antonym of 'accidental.'" Id. "A plaintiff under [such policies] has the burden of proving an accidental death, thereby negativing suicide." Id.; White, 198 CAl.App.2d at 377. That is, "the burden rests upon the plaintiff to prove that the death was not a suicide." Blake, 99 Cal.App.4th at 924.

*Discussion*

---

[3]California courts recognize a distinction between policies that cover "accidental means" and "accidental results/death." E.g., Olson v. American Bankers Ins. Co. of Fla., 30 Cal.App.4th 816, 822-23 (1994). For purposes of this motion, the distinction is not relevant. Cf. Zuckerman, 42 Cal.2d at 472.

10

Parker has the burden of showing that Decedent's death fits within the coverage of the Policy, see Aydin, 18 Cal.4th at 1188, and she does not dispute that the Policy was an accidental death and dismemberment policy. DUMF No. 3. Because the Policy is an accidental death policy, as opposed to a general life insurance policy, Parker bears the burden of establishing that the Decedent's death was accidental which entails a showing that the death was not by suicide. See Zuckerman, 42 Cal.2d at 472-74; Blake, 99 Cal.App.3d at 923-24; White, 198 Cal.App.2d at 377. The evidence presented by FSI convincingly points to a conclusion of suicide. There is no dispute that the Coroner found, and the Death Certificate indicates, that Decedent's death was due to suicide through ingestion of sufficient prescription medication and alcohol. See DUMF Nos. 16-18. There is no dispute that the medical records indicate suicide by intentional overdose. See DUMF No. 12; Warren Declaration Exhibit I. There is no dispute that a suicide note was found. See DUMF No. 19; Warren Declaration Exhibit I; Boggs Report at 59. Finally, there has been no challenge to or dispute that Decedent told paramedics that he had been drinking beer and whiskey, had taken approximately 15 pills, and did not want to wake up. See DUMF No. 19; Warren Declaration Exhibit P.

With respect to the opinion of Dr. Boggs,[4] his report is not as limited as FSI suggests. Dr. Boggs indicates that the level of Darvocet detected by the toxicology report was within the range of therapeutic use, that the level of Paxil was at the lower range of what might be toxic (although it is not clear whether the level of Paxil detected by the toxicology test was .11 or .14 mg/l and Dr. Boggs indicates that .10 mg/l is the bottom end of potentially toxic), that the level of Xanax was just over the upper therapeutic range and was inconsistent with a person who had taken 22 tablets, and that the alcohol level was consistent with someone who was a chronic drinker. See Boggs Report at 59-60. As the Court understands Dr. Boggs's report/opinion, Dr. Boggs concludes that the death was accidental because each of the component parts of the substances ingested (alcohol,

---

[4] Dr. Boggs's report is before the Court because of FSI. The report is not sworn and Dr. Boggs's background and experience is unknown, other than he purports to be "an experienced emergency room physician." Boggs Report at 60. For purposes of this motion, the Court will assume that Dr. Boggs is qualified to render medical opinions in this case and that he would continue to stand by his report while under oath.

Darvocet, Paxil, and Xanax) were individually not overly toxic, as reflected in the toxicology report. Because the individual parts were not overly toxic, and because the number of tablets remaining were more than if Decedent had been regularly taking his medication, such evidence suggests that Decedent did not intentionally overdose and was not attempting to commit suicide by overdosing.

However, although Dr. Boggs states that the toxicology levels are inconsistent with ingestion of 28 or more tablets, he does not state what number of tablets are consistent with the toxicology levels. The 28 tablet figure appears to be ultimately based on the "Prehospital Report" which stated that the Decedent "possibly" ingested 6 Darvocet and 22 Xanax. See Warren Exhbit I at 38-39. The Coroner's supplemental report, which is dated April 30, 2004, indicates that Decedent had said that he had ingested about 15 pills. See DUMF No. 19; Exhibit P. Dr. Boggs never addresses Decedent's purported statements to the paramedics that he did not want to wake up. More importantly, although Dr. Boggs acknowledges Decedent's severe depression and the discovery of a suicide note, he nowhere discusses their significance or how those factors should be considered. Dr. Boggs's opinion appears to boil down to the Decedent did not commit suicide because the toxicology levels are inconsistent with taking 28 pills. However, whether someone takes large numbers of multiple medications or slightly more than that which is prescribed is not material if the intent is to commit suicide or to "not wake up again." The toxicology levels in no way address or explain Decedent's severe depression, refusal of treatment such that sheriff deputies had to become involved, the statement that Decedent did not want to wake up again, and, critically, the discovery of a suicide note.[5] Stated differently, the toxicology levels and Dr. Boggs's report do not sufficiently refute the conclusion that the Decedent had a suicidal intent. As Dr. Boggs's opinion currently stands,[6] at best, it creates a "merely colorable" issue of fact, it

---

[5] Further, there is no indication that the Coroner changed his conclusion of "suicide" even after reviewing Dr. Boggs's report/opinion.

[6] Again, the Court assumes that Dr. Boggs would give the same opinion under oath, since the report before the Court is not sworn and was prepared for the Coroner and/or FSI to review.

12

does not create a genuine material issue for trial.  See Anderson, 477 U.S. at 249-50; Hardage, 427 F.3d at 1187.  Parker has not met her burden of presenting evidence that shows an accidental, non-suicidal death.  See Aylin, 18 Cal.4th at 1188; Zuckerman, 42 Cal.2d at 472-74; Blake, 99 Cal.App.3d at 923-24; White, 198 Cal.App.2d 370, 376-77.

As for medical malpractice, assuming that death by medical malpractice falls within the Policy's coverage, the burden would rest on Parker to show medical malpractice.  Cf. Aydin, 18 Cal.4th at 1188; Zuckerman, 42 Cal.2d at 472-74.  In California, "expert testimony is required to prove or disprove that the [healthcare provider] performed in accordance with the standard prevailing of care unless the negligence is obvious to a layperson." Johnson v. Superior Court, 143 Cal.App.4th 297, 305 (2006).  Here, that multiple attempts, and eventually the assistance of a surgeon, were required to intubate Decedent is not in and of itself obviously negligent and Parker has presented no expert evidence regarding malpractice.  In fact, Dr. Boggs states that death was due to the combination of Xanax, Darvocet, and alcohol.  Dr. Boggs purports to be an emergency room physician and he does not mention any negligence in the intubation process or in Decedent's care in general.  Parker has not met her burden of presenting evidence that shows death due to medical malpractice.  See Aylin, 18 Cal.4th at 1188; Zuckerman, 42 Cal.2d at 472-74.

**2.  BAD FAITH CLAIM**

*Defendant's Argument*

FSI argues that, since there was no breach of contract, there was no breach of the duty of good faith and fair dealing.  Further, even if there is a genuine disputed issue of material fact regarding breach of contract, given the medical records, coroner report, and death certificate, FSI acted reasonably.

*Plaintiff's Argument*

Parker has filed no opposition or response of any kind.

*Discussion*

13

     FSI is correct in both of its arguments.  As discussed above, the evidence presented by FSI indicates suicide and Parker has not met her burden of presenting evidence that could reasonably show accidental death.  When there is no breach of the insurance policy, a claim for the breach of the duty of good faith and fair dealing, i.e. bad faith, will necessarily fail.  See Waller v. Truck Ins. Exch., 11 Cal.4th 1, 36-37 (1995); Cheviot Vista Homeowners Assn. v. State Farm Fire & Casualty Co., 143 Cal.App.4th 1486, 1497 (2006).

     Alternatively, there was clearly a genuine dispute between Parker and FSI.  "[A]s long as the insurer's coverage decision was reasonable, it will have no liability for breach of the covenant of good faith and fair dealing."  Morris v. Paul Revere Life Insurance Co., 109 Cal.App.4th 966, 973 (2003). The withholding of benefits due under the policy is not unreasonable if there is a genuine dispute between the insurer and the insured as to coverage or the amount of payment due. Jordan v. Allstate Ins. Co., 148 Cal.App.4th 1062, 1072 (2007); Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co., 90 Cal.App.4th 335, 349 (2001).  As discussed above, the medical records and death certificate state that Decedent's death was a suicide and the Coroner's report indicates that the Decedent left a suicide note, said that he had taken multiple pills and did not want to wake up again.  In contrast, Parker presented only the report of Dr. Boggs.  There is no evidence that indicates FSI conducted a biased or insufficient investigation.  Cf. Chateau Chamberay, 90 Cal.App.4th at 348-49.   Summary judgment on this claim is alternatively appropriate under the genuine dispute doctrine.  See Jordan, 148 Cal.App.4th at 1072; Chateau Chamberay, 90 Cal.App.4th at 349.

---

## CONCLUSION

    FSI has moved for summary judgment on all claims, presented evidence that Decedent's death was a suicide, and that suicidal deaths are not covered by the Policy.  The only contrary evidence is the unsworn report by Dr. Boggs, but that report fails to address key considerations, especially the suicide note and statements to the paramedics.  FSI has done enough to sustain its initial burden.  Parker was required to produce evidence of her own that would create a genuine

dispute that the Decedent's death was accidental. Parker failed to do so and did not file a response or opposition of any kind. Summary judgment in favor of FSI on Parker's breach of contract claim is appropriate.

Regarding the bad faith claim, because summary judgment has been granted on the breach of contract claim, the bad faith claim of necessity fails as well. Alternatively, the evidence presented has sufficiently established that a genuine dispute existed between Parker and FSI. Therefore, summary judgment on Parker's bad faith claim is appropriate.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendant's motion for summary judgment is GRANTED;
2. The clerk is directed to enter judgment in favor of Defendant; and
3. The clerk is directed to close this case.

IT IS SO ORDERED.

**Dated:   May 16, 2007**                         /s/ Anthony W. Ishii
                                                   UNITED STATES DISTRICT JUDGE