1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

### IN THE UNITED STATES DISTRICT COURT FOR THE

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DEBORAH L. PARKER,** ) | **CIV F 06-654 AWI DLB** |
| ) | |
| **Plaintiff**, ) | **ORDER ON DEFENDANT'S** |
| **v.** ) | **MOTION FOR SUMMARY** |
| ) | **JUDGMENT** |
| **FIDELITY SECURITY  LIFE** ) | |
| **INSURANCE CO., a corporation, DOE 1,)** | |
| **DOE 2, DOE 3, DOE 4 and DOES 5-100, )** | |
| ) | |
| **inclusive,** ) | |
| ) | |
| **Defendants.** ) | |
| ———————————————————— ) | |

17    This case stems from the denial of monetary benefits under an accidental death and

18  dismemberment insurance policy.  The beneficiary of the policy, Deborah Parker ("Parker"),

19  originally brought suit against Fidelity Security Life Insurance Co. ("FSI") in state court and

20  alleged three causes of action: (1) breach of contract, (2) breach of the duty of good faith and fair

21  dealing, and (3) failure to investigate.  FSI later removed to this Court.  This Court granted in part

22  and denied in part FSI's Rule 12(b)(6) motion with leave to amend and characterized the third

23  cause of action as a method of showing a breach of the duty of good faith and fair dealing.  Parker

24  filed no new complaint.  FSI moved for summary judgment which this Court granted largely

25  because Parker filed no opposition.  The Court later vacated that judgment under Rule 60(b)(1).

26  Parker has now filed an opposition.  For the reasons that follow, FSI's motion will be granted.

27

28                                     **FACTS**

     FSI issued to Richard Parker ("Decedent") and Deborah Parker a policy of accidental

death and dismemberment insurance with an effective date of April 1, 2003 ("the Policy").

DUMF No. 3.[1]  Subject to its terms, conditions, definitions and exclusions, the Policy included

death and dismemberment coverage up to a maximum of $273,000.  Id.  The Policy contained the

following pertinent language:

> If the Insured Person, as a result of injury, shall accidentally sustain, directly and independently of all other causes, any of the losses described below within ninety (90) days of such injury, the Company will pay the amount specified for such loss.
>
> For Loss of . . . Life
> . . .
>
> EXCLUSIONS
>
> We will not pay benefits for a loss caused or contributed by:
>
> (a) Suicide, or any attempt thereat, while sane, . . .

Id.

On the night of April 8, 2004, Parker called 911 and said that Decedent was trying to

commit suicide.  See June 2007 McNamara Declaration Exhibit A at 14-15 (hereinafter

"McNamara Declaration").  Decedent was taken to the hospital involuntarily pursuant to a

California Health and Welfare Code § 5150 hold.  See Warren Exhibit I at 38.  Decedent was

admitted to Oak Valley Hospital at approximately 10:50 p.m. on April 8, 2004.  DUMF No. 25.

At 6:25 a.m. the following day, Decedent was admitted to the intensive care unit after undergoing

an operation to relieve pressure in his abdomen.  DUMF No. 26.  At 10:10 a.m. on April 9, 2004,

Decedent was removed from a ventilator per his doctor's order which was obtained after

consultation with Parker.  DUMF No. 27.  At 10:15 a.m., Decedent was pronounced dead by his

treating physician.  DUMF No. 28.

Through a letter sent by her attorney and dated May 18, 2004, Parker submitted a claim to

FSI for benefits under the Policy; Parker stated that Decedent died as a result of "drug and ethanol

toxicity/med. malpractice."  See DUMF Nos. 4-5.  In support of the claim, Parker submitted a

Proof of Death form, a certified Death Certificate, the Stanislaus County Coroner's autopsy report

---

[1]"DUMF" refers to Defendant's Undisputed Material Facts, and "PUMF" refers to Plaintiff's Undisputed Material Facts.

pertaining to Decedent, and a copy of the original Policy.  DUMF Nos. 6-9.

On December 10, 2004, FSI denied Parker's claim and explained:

> The copy of the death certificate indicates the Cause of Death as 'Pending Tox' and the Manner of Death is indicated as 'Pending Investigation.'  The Coroner's report indicates, 'Acute combined drug and ethanol toxicity with other significant conditions: Cardiomegaly with left Ventricular Hypertrophy.'  Information from Oak Valley Ambulance indicates, 'Patient left a note stating his intentions to die,' and Oak Valley Hospital records indicate the final diagnosis as 'Attempted suicide and overdose.'

DUMF No. 10; Warren Exhibit G.  FSI invited Parker to provide an original death certificate "which indicates the Cause and Manner of Death" as well as the opportunity to have the decision reviewed.  DUMF No. 11.[2]  FSI required that a request for review be in writing and "state the reason(s) you feel the claim should be favorably considered."  Id.

Decedent's medical records indicated a diagnosis of suicide by means of drug and alcohol toxicity and overdose, and also reference poisoning.  See Warren Exhibit I at 45-47; DUMF No. 12;[3] Warren Exhibit I at 45-47.  The medical records further indicated that the Decedent had a history of "severe depression."  See Warren Exhibit I at 39;[4] see also Warren Exhibit J.[5]

The Coroner's report indicated that Decedent's death had been submitted to the Coroner to

---

[2]DUMF No. 11 is based on Warren Exhibit H, a letter from Fidelity to Parker.  Parker objects to Exhibit H as irrelevant under Rule of Evidence 402.  However, Exhibit H is relevant as background and to the reasonableness of Fidelity's conduct with respect to Parker's bad faith claim.  The objection to Exhibit H is overruled.

[3]Parker argues that the medical records, when read in conjunction with Dr. Boggs's report, Dr. Yang's deposition, her own deposition, and the declaration Sandy Berbena show that Decedent died due to medical negligence or medical accident.  However, Dr. Boggs's report does not purport to render any testimony regarding the treatment received by Decedent, Dr. Yang did not testify that any medical negligence or medical accident occurred, the critical portions of the Berbena declaration are inadmissible hearsay (paragraphs 5 through 9), the portion of Parker's declaration relied upon also contains hearsay, and the medical records do indicate a diagnosis of suicide.  See Warren Exhibit I at 45-47.

[4]Parker objects to Warren Exhibit I, which are decedent's medical records for the days April 8 and April 9, 2004.  Parker objects that the records are irrelevant, there is no foundation for the records, and that any opinions to be drawn from the records must come from a designated expert, which there is none.  However, the medical records are clearly relevant, and the 402 objection is overruled.  There is a sufficient foundation for the medical records in that Kevin Warren's uncontradicted declaration indicates that they were produced by Parker during discovery.  See Orr v. Bank of Am., 285 F.3d 764, 777 n.20 (9th Cir. 2002); Warren Declaration at ¶ 3.  The Court agrees that expert testimony is necessary to interpret aspects of the medical records, but expert testimony is not necessary for every aspect of the records.  Parker's blanket 702 objection to the entirety of Exhibit I is overruled.

[5]Parker objects to Warren Exhibit J, report of Dr. Boggs, as being incomplete because it does not contain a particular sentence.  However, the identified sentence is part of Exhibit J.  Parker's objection is overruled.

"Rule out overdose."  See DUMF No. 18; Exhibit O.  The Coroner's report stated in part: "At the residence the decedent was talking with medical personnel, and stated that he had been drinking beer and whiskey, and had taken approximately 15 pills.  He stated to paramedics that he just wanted to go to sleep and not wake up.  A suicide note was found at the residence concerning cremation and who to contact."  DUMF No. 19.[6]  Although the note has apparently been lost, Parker testified that it said, "No services.  Sandy knows where I want my ashes."  Parker Deposition at 31:17-18.  Decedent's Death Certificate was updated after the toxicology investigation was completed and was accepted for registration on May 20, 2004.  See DUMF No. 17; Exhibit N.[7]  The Coroner's final conclusion was that Decedent's "Immediate Cause" of death was: "Suicide . . . Ingested enough prescription medication and alcohol to cause death."  Id.

At some point, Parker had Dr. Brandon Boggs, an emergency room physician, review Decedent's medical records in connection with her claim and this litigation.  See Warren Declaration Exhibit J ("Boggs Report").  Dr. Boggs formed an opinion that Decedent did not commit suicide.  Dr. Boggs's opinion was purportedly based in part on an analysis of the number of pills prescribed, compared to the number of pills missing form the bottles found after Decedent was taken to the hospital.  See DUMF No. 13.  Dr. Boggs's report is unsworn and states in relevant part:

> After reviewing the case in depth and as an experienced emergency room

---

[6]Parker objects to the Coroner's report as inadmissible under *Bohrer v. County of San Diego*, 104 Cal.App.3d 155, 164-65 (1980), and improper foundation.  *Bohrer* is a California state case that does not purport to apply, or even to mention, federal law, and Parker does not explain why it would control in this case.  Additionally, that case does not hold that coroner reports are inadmissible.  In fact, the Court of Appeals indicated that such reports generally may be admitted as *prima facie* evidence of cause of death.  See Bohrer, 104 Cal.App.3d at 164-65.  What the *Bohrer* court found to be improper was taking judicial notice of the coroner report's and death certificate's conclusion of suicide as part of ruling on a demurrer, where the effect was to indisputably establish cause of death.  See id.  This Court is not judicially noticing the coroner's report, and Parker is free to dispute the report's conclusions.  With respect to foundation, the report is stamped as a controlled document, the stamp is initialed and dated, the same stamp is on the autopsy report which was produced by Parker during discovery (the stamp on the autopsy report indicates that it was released to Kimberly Rigg, who is Parker's counsel's secretary), the document purports to be a coroner's report, and the declaration of Kevin Warren indicates that the report is a public document that was obtained from a public agency.  This is sufficient for the Court to conclude that the coroner's report is what FSI claims it to be.  See Fed. R. Evid. 901.

[7]Parker objects that the death certificate is without foundation and hearsay.  The death certificate is excepted from the hearsay rule as a record of vital statistics, see Fed. R. Evid. 803(9), is also self-authenticating, see Fed. R. Evid. 902(1), and was produced to Fidelity by Parker during discovery.  The objection is overruled.

physician, it is solely my opinion that there are major discrepancies in the presumed diagnosis of intentional drug ingestion and suicide attempt.  These discrepancies are as follows: (1) The alleged ingestion of 6 Darvocet with a prescription filled 8 days prior to this for a total of 60 with one every eight hours as the prescribed dose and a total of 14 missing after 8 days of use, which if being used prescribed could have shown 24 missing is used to the maximum dosing as allowed by his primary physician.  Less pills missing than the prescribed dose rather than more pills missing is not consistent with intentional overdose.  (2) The alleged 22 Xanax pills of 1 mg each with toxicity level of .11 mg/l with the proper level of therapeutic range being .10 mg/l, showing that the ingestion of 22 pills to be very unlikely.  This combined with a prescription filled 8 days prior for 120 pills with 105 remaining in the bottle and prescribed to take three times a day would total 24 pills used, not 15.  Once again, less pills used than prescribed instead of more than prescribed is not consistent with intentional overdose.  (3) The alleged 6 Darvocet 100 taken which contain 100mg of propoxyphene and 650 mg of Tylenol with a toxicology level of .19 mg/l, .16 mg/l for norpropoxyphen, a three hour Tylenol level of 53 mg/l and subsequent decreased levels thereafter showing this to be the peak level.  These levels correlate to the effective range of propoxyphene and norpropoxyphene, not toxic levels and the Tylenol level is not consistent with a toxic level ingestion of Darvocet as the source of the Tylenol.  (4) The alleged unknown amount of Paxil ingested with a level of .11 with .10 being at the bottom of the potentially toxic range.[8]  (5) The coroner's report stating that no pill fragments were found in the gastrointestinal tract but that the charcoal which was administered by the hospital staff approximately 2 hours after the ingestion was present, is inconsistent with the ingestion of the alleged 28+ pills.  (6) The alcohol level of .22 mg/l in a known patient that uses alcohol daily according to the primary physician's history and physical is consistent with the possibility and not an acute ingestion for the purpose of suicide.  As a result of the preceding discrepancies and evidence, it is my opinion that this patient most likely died of the combined effects of Xanax, Darvocet, and alcohol with the evidence pointing toward poor decision making by a depressed patient in that he chose to drink alcohol and take his regular meds as prescribed and not an intentional overdose and suicide attempt by taking more medicine than he was prescribed.

Boggs Report at 60.

The figures of 22 tablets of Xanax and 6 tablets of Darvocet appear to come from the

medical records in the "Prehospital Report" and the "Oak Valley Hospital Emergency Physician

Record, Ingestion/Swallowed Foreign Body" form.  See Warren Exhibit I at p. 38-39; see also

Boggs Report at p. 59.  The "Prehospital Report" form indicates in the call summary section:

PT took possibly 22 Xanax, 6 Darvocet, and an unknown amount of Paxil tablets of unknown strengths, with alcohol and sat in chair where he went to sleep.  PT left a note stating his intentions to die.  Upon arrival found PT out on patio, conscious alert but obviously intoxicated with alcohol.  PT does not denies [sic] taking the medications.  PT at first did not want treatment but sheriff deputy placed him under 5150 hold.

---

[8]However, earlier in the report, Boggs states that the toxicology report indicated that the Paxil level was .14 mg/l.  See Warren Exhibit J at p. 60.

Warren Exhibit I at p. 38; see also Boggs Report at 59.

Parker's attorney wrote to the Coroner on March 30, 2005, and requested that Decedent's cause of death be changed from suicidal to accidental based on Dr. Boggs's report and conclusions. See DUMF No. 16; Warren Declaration Exhibit M.[9]   It does not appear that the requested changes were made by the Coroner or that the Coroner's conclusions have changed.

In response to interrogatories, Parker stated, "While at the hospital, intubation was attempted on numerous occasions by the attending emergency room physician. In the process of doing so, the intubation was placed into the stomach of Richard Parker, thereby plugging the airway causing suffocation which was the cause of his accidental death." DUMF No. 20. Parker testified that her only support for her contention that Decedent died as a result of medical malpractice, other than what her lawyer told her, was "[b]y his appearance after I returned to the hospital and by reading the ER report."[10]   DUMF No. 21.  Medical records indicate that the emergency room personnel attempted intubation multiple times, but were unsuccessful. See PUMF No. 3.[11]   An anesthesiologist, Dr. Yang, was called and arrived at about 1:45 a.m., and successfully intubated Decedent shortly thereafter. See Warren Exhibit I at 48; Yang Deposition at 11:2-6.  Yang testified that he noted that Decedent was comatose[12] and his abdomen was hard as a rock, which could be consistent with an intubation that went to the stomach instead of the

[9]Parker objects that Warren Exhibit M, the letter to the coroner, is irrelevant. Because the conclusions of the coroner are at issue, the letter is relevant. The objection is overruled.

[10]Parker has submitted two proposed undisputed facts that deal the Decedent's medical condition after admission, PUMF Nos. 1 and 2. These PUMF's are based on Paragraph 5 and Paragraph 6 of the Declaration of Sandy Berbena, the Decedent's daughter. FSI has objected that these paragraphs are hearsay and lack foundation. The Court agrees and the objections are sustained. Paragraphs 5 and 6 of the Berbena declaration will not be considered and PUMF Nos. 1 and 2 are not established.

[11]PUMF No. 3 is based on the medical records, which is Warren Exhibit L, and states that the emergency room personnel made 5 attempts to intubate Decedent. Parker does not pinpoint where in the medical records it indicates that intubation was attempted 5 times. The references to intubation that the Court has found indicate that "multiple" attempts were made. See Warren Exhibit L at 48.

[12]As part of PUMF No. 4, Parker indicates that "comatose" means "brain dead." This PUMF is supported by references to Yang's deposition. Those references do not indicate that "comatose" means brain dead. According to the Stedman's medical dictionary, "comatose" means "in a state of coma," and "coma," in turn, is defined in part as "a state of profound unconsciousness from which one cannot be roused." Stedman's Medical Dictionary at p. 385 (27th ed.).

lungs.[13]  See Yang Deposition at 11:9-15, 18:18-19:9.  Despite her alleged medical malpractice claim, Parker has never spoken to anyone at the hospital about the cause of Decedent's death.  DUMF No. 22.  Parker has never filed a claim against the hospital or any of the doctors that treated Decedent on the night of the incident.  DUMF No. 23.[14]  Parker's own medical expert, Dr. Boggs, reached the conclusion that Decedent had "most likely died of the combined effects of Xanax, Darvocet, and that he chose to drink alcohol and take his regular meds as prescribed," and never mentioned any act or omission that indicates that medical malpractice contributed to or caused Decedent's death.  DUMF No. 24.  Also, Parker testified that Decedent regularly took either too much or too little of his medication, and that it was difficult to keep him on his prescribed level of medication.  DUMF No. 14.[15]  Parker testified that she had no idea how much medication Decedent had taken in the twelve hours prior to her call for help to 911.  DUMF No. 15.[16]

Finally, FSI has submitted a transcript of a 911 call made by Parker on April 8, 2004.  The transcript in relevant part reads:

> **Parker:**      **Yes.  I need an ambulance.**
>
> . . . . . .      (address information given)
>
> Speaker:      Ok.  And what's going on there?
>
> **Parker:**      **My husband's trying to commit suicide.**

---

[13]Dr. Yang also testified that two causes of Decedent's distended abdomen could have been improper intubation or an interaction between the medications that Decedent took which could have caused precipitation in the stomach.  See Yang Deposition at 14:22-15:3.  Dr. Yang testified that he did not know what caused the condition of Decedent's abdomen.  See id. at 14:18-21.

[14]DUMF Nos. 21, 22, and 23 are all based on Warren Exhibits R, S, and T, which are excerpts from Parker's deposition.  Parker objects that these exhibits are irrelevant, conclusory and not admissible.  The deposition excerpts deal with Parker's basis or understanding of her claim of medical malpractice.  The testimony is relevant and an admission of a party opponent.  The objections are overruled.

[15]Parker objects that it is irrelevant whether Decedent regularly took too much or too little medication.  However, this case deals with ingestion of medication.  Decedent's practices with his medication are entirely relevant.  The objection is overruled.

[16]Parker objects that this fact is irrelevant.  However, this case deals with ingestion of medication.  Her testimony on this issue is relevant.  The objection is overruled.

| | | |
|---|---|---|
| Speaker: | Ok.  How is he trying to commit suicide? | |

Speaker: Ok.  How is he trying to commit suicide?

**Parker:** **He took a bunch of pills, and he's not conscious.  I have no idea exactly what he took.**

. . . . . . . . .

Speaker: Ok.  Are there any other weapons in the house?

**Parker:** **They're locked up.  And I made sure of that a long – a few days ago. Not a long time ago.**

Speaker: Ok.  So, all the weapons are locked up?

**Parker:** **Yes.**

McNamara Declaration Exhibit A at 14-15, 19.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985).  Where summary judgment requires the court to apply law to undisputed facts, it is a mixed question of law and fact.  See Sousa v.Unilab Corp. Class II (Non-Exempt) Members Group Benefit Plan, 252 F. Supp.2d 1046, 1049 (E.D. Cal. 2002).  Where the case turns on a mixed question of law and fact and the only dispute relates to the legal significance of the undisputed facts, the controversy for trial collapses into a question of law that is appropriate for disposition on summary judgment.  See Union Sch. Dist. v. Smith, 15 F.3d 1519, 1523 (9th Cir. 1994); Sousa, 252 F.Supp.2d at 1049.

the party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and

8

1    upon motion, against a party who fails to make a showing sufficient to establish the existence of

2    an element essential to that party's case, and on which that party will bear the burden of proof at

3    trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving

4    party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary

5    judgment should be granted, "so long as whatever is before the district court demonstrates that the

6    standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

7        If a moving party fails to carry its burden of production, then "the non-moving party has

8    no obligation to produce anything, even if the non-moving party would have the ultimate burden

9    of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th

10   Cir. 2000). If the moving party meets it initial burden, the burden then shifts to the opposing party

11   to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus.

12   Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine Ins., 210 F.3d at

13   1103; Nolan v. Cleland, 686 F.2d 806, 812 (9th Cir. 1982); Ruffin v. County of Los Angeles, 607

14   F.2d 1276, 1280 (9th Cir. 1979). A fact is "material" if it might affect the outcome of the suit

15   under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986);

16   Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir.

17   2002). A "genuine issue of material fact" arises when the evidence is such that a reasonable jury

18   could return a verdict for the nonmoving party. See Anderson, 477 U.S. at 248-49; Thrifty Oil,

19   322 F.3d at 1046.

20       In attempting to establish the existence of a factual dispute, the opposing party may not

21   rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of

22   specific facts in the form of affidavits, and/or admissible discovery material, in support of its

23   contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank,

24   391 U.S. at 289; Willis v. Pacific Maritime Ass'n, 244 F.3d 675, 682 (9th Cir. 2001). However,

25   the opposing party need not establish a material issue of fact conclusively in its favor. It is

26   sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

27   parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; Hopper v. City

28   of Pasco, 248 F.3d 1067, 1087 (9th Cir. 2001). Thus, the "purpose of summary judgment is to

1   'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

2   trial.'"  Matsushita, 475 U.S. at 587; Mende v. Dun & Bradstreet, Inc., 670 F.2d 129, 132 (9th Cir.

3   1982).

4          In resolving a summary judgment motion, the court examines the pleadings, depositions,

5   answers to interrogatories, and admissions on file, together with the affidavits, if any.  See Rule

6   56(c); Fortyune, 364 F.3d at 1079-80.  The court has the discretion in appropriate circumstances

7   to consider materials that are not properly brought to its attention, but the court is not required to

8   examine the entire file for evidence establishing a genuine issue of material fact where the

9   evidence is not set forth in the opposing papers with adequate references.  See Southern Cal. Gas

10  Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified

11  Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  The evidence of the opposing party is to be

12  believed, and all reasonable inferences that may be drawn from the facts placed before the court

13  must be drawn in favor of the opposing party.  See Anderson, 477 U.S. at 255; Matsushita, 475

14  U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless,

15  inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

16  factual predicate from which the inference may be drawn.  See Mayweathers v. Terhune, 328

17  F.Supp.2d 1086, 1092-93 (E.D. Cal. 2004); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993,

18  997 (E.D. Cal. 2004).  "A genuine issue of material fact does not spring into being simply because

19  a litigant claims that one exist or promises to produce admissible evidence at trial."  Del Carmen

20  Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see also Bryant v. Adventist Health

21  System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).

22         Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

23  show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as

24  a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

25  issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).  "A motion for summary

26  judgment may not be defeated, however, by evidence that is 'merely colorable' or 'is not

27  significantly probative.'"  Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d

28  1177, 1183 (9th Cir. 2006).  If the nonmoving party fails to produce evidence sufficient to create a

genuine issue of material fact, the moving party is entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at 1103.

## 1.    BREACH OF CONTRACT CLAIM

### Defendant's Arguments

FSI argues that the materials submitted by Parker indicated that Decedent's death was a suicide due to toxicity from medication and alcohol.  The medical records have a final diagnosis of suicide, the final Coroner's report and death certificate indicate suicide, and documentation from the Coroner shows that a suicide note was found, Decedent said he took about 15 pills, and that he did not want to wake up.  Boggs's opinion is unreliable because it is based primarily on comparing the left over tablets with the number that should be missing if Decedent had been taking the medications as described.  However, Parker herself testified that it was very difficult to keep Decedent on his medication and that he did not regularly take his medication.  Finally, Parker's claim that the Decedent died from medical malpractice has no support.  There have been no medical opinions offered by Dr. Boggs or any other physician that Decedent received negligent care.  Parker has not spoke to anyone about malpractice or filed suit against any of the responsible health care providers.  The evidence shows that Decedent committed suicide, did not die from medical malpractice, and the death was not covered by the policy.

### Plaintiff's Opposition

Parker argues that there is a dispute whether the death was accidental and whether Decedent was sane.  The Policy has an exclusion for suicide while sane.  It is therefore FSI's burden to establish a suicide and that Decedent was sane.  FSI cannot meet this burden.  Decedent was diagnosed as having depression and early onset Alzheimer's disease.  Decedent drank too much, became disoriented, was hospitalized and was in the process of recovery when a medical accident ended his life.  Given his medical history, Decedent died following an episode in which he accidentally drank too much, followed by a medical accident that cut off his breathing.  While at the hospital, Decedent was improperly intubated, i.e. the tube went to the stomach instead of the lungs, which caused a distended stomach and lead to oxygen deprivation.  By the time Dr. Yang

arrived to intubate Decedent, Decedent was already brain dead.  Decedent's poor decisions and the improper intubation was the efficient proximate cause of Decedent's death.

Further, the police report indicates that the sheriff's deputy filled out a 5150 hold on Decedent and stapled the alleged suicide note on the back.[17]  A 5150 hold is authorized for persons who have mental disorders.  See Cal. Wel. & Inst. Code § 5150.  Further, the medical records indicate that Decedent was not sane since Decedent was on psychiatric medication and had depression and early onset Alzheimer's disease.

Also, there is no sufficient evidence that Decedent committed suicide.  Parker performed a pill count and no pills were missing.  In conjunction with Dr. Boggs's report, the evidence suggests that there was no suicide since the blood samples show that there was not a lethal level of drugs in Decedent's body at the time of death.  Further, reliance on the coroner's report is improper since that report is not admissible under *Bohrer*, and without the coroner's report, FSI has no evidence of suicide.[18]

With respect to a "suicide note," no such note has been produced.  Further, the purported contents of "cremation and who to contact" could have easily been the start of a list to be provided to a lawyer for the purpose of preparing a will.  At best, such a note creates an issue of fact as to its meaning and secondarily as to Decedent's state of mind.

*Legal Standard*

In first party insurance cases, the claimant or insured has the burden of establishing that the occurrence forming the basis of her claim is within the basic scope of insurance coverage.  MacKinnon v. Truck Ins. Exchange, 31 Cal.4th 635, 648 (2003); Aydin Corp. v. First State Ins. Co., 18 Cal.4th 1183, 1188 (1998).  Once this showing has been made, the burden then shifts to the insurer to prove that the claim is specifically excluded.  MacKinnon, 31 Cal.4th at 648; Aydin, 18 Cal.4th at 1188; Searle v. Allstate Life Ins. Co., 38 Cal.3d 425, 437-38 (1985).  Insurance coverage clauses are "interpreted broadly so as to afford the greatest possible protection to the

---

[17]However, the Sheriff Deputy's report has not been submitted to the Court.  Because the report has not been submitted, the contents or reported contents of such a report will not be considered by the Court.

[18]However, despite Parker's argument, for the reasons stated in footnote 5, *supra*, *Bohrer* is not controlling.

insured," but "exclusionary clauses are interpreted narrowly against the insurer." TRB Investments, Inc. v. Fireman's Fund Ins. Co., 40 Cal.4th 19, 27 (2006); MacKinnon, 31 Cal.4th at 648.

Generally, in cases involving life insurance polices that cover the death of an insured, the burden of relying on a suicide exclusion and proving suicide rests on the insurer. See Searle, 38 Cal.3d at 438. This burden "requires more than proof of the act of self-destruction, the proof must further establish that the act was committed with suicidal intent, i.e., the purposeful or intentional causing of death." Id. at 437. However, in cases involving accident insurance policies where coverage is provided for "accidental injury" or "accidental death," the claimant bears the burden of establishing that the injury or death was accidental.[19] See Zuckerman v. Underwriters at Lloyd's, 42 Cal.2d 460, 472-74 (1954); Blake v. Aetna Life Ins. Co., 99 Cal.App.3d 901, 923-24 (1979); White v. Aetna Life Ins. Co., 198 Cal.App.2d 370, 376-77 (1961); see also Clemmer v. Hartford Ins. Co., 22 Cal.3d 865, 880 (1978). The term "accident" has been defined as "a casualty -- something out of the usual course of events and which happens suddenly and unexpectedly and without any design of the person injured." Zuckerman, 42 Cal.2d at 473. "Death by suicide reasonably may be said to have been caused by 'intentional self-injury,'" and "'intentional self-injury' . . . is the antonym of 'accidental.'" Id. "A plaintiff under [such policies] has the burden of proving an accidental death, thereby negativing suicide." Id.; White, 198 CAl.App.2d at 377. That is, "the burden rests upon the plaintiff to prove that the death was not a suicide." Blake, 99 Cal.App.4th at 924.

### Discussion

Parker's argument as to the burdens in this case rest on the burdens normally utilized in ordinary life insurance policies, but Parker does not address the burden of proof framework established by *Zuckerman* for such policies. Parker is correct that the Policy in this case contains a suicide exclusion. However, there were also suicide exclusions in *Zuckerman*, *White*, and

---

[19]California courts recognize a distinction between policies that cover "accidental means" and "accidental results/death." E.g., Olson v. American Bankers Ins. Co. of Fla., 30 Cal.App.4th 816, 822-23 (1994). For purposes of this motion, the distinction is not relevant. Cf. Zuckerman, 42 Cal.2d at 472.

*Blake*.  See Zuckerman, 42 Cal.2d at 467; Blake, 99 Cal.App.3d at 905; White, 198 Cal.App.2d at

372.  The policies in those cases, like the Policy in this case, insured against accidental injuries

and death.  See id.  In order to show that the deaths in those cases were covered events, the

insureds had to establish accidents.  Because suicide is the antonym of accidental, in order to

show an accidental death, the insureds in those cases bore the burden of disproving suicide.

Zuckerman, 42 Cal.2d at 472-74; Blake, 99 Cal.App.3d at 923-24; White, 198 Cal.App.2d at 376-

77.  As the California Supreme Court explained in *Clemmer* in its discussion of *Zuckerman*,

suicide exclusions in such accidental death policies essentially operate to further define the risks

covered; they do not act as conditions subsequent and thus, do not shift the burden of proof to the

insurer.  See Clemmer, 22 Cal.3d at 880; see also Zuckerman, 42 Cal.2d at 474; Blake, 99

Cal.App.3d at 923.  "The burden of establishing suicide, therefore, should not have been put on

the insurer [as the plaintiffs had contended], as the provision as to death from that cause was not a

condition subsequent but merely definitive of the precise risk assumed."  Clemmer, 22 Cal.3d at

880; Zuckerman, 42 Cal.2d at 474; see also Blake, 99 Cal.App.3d at 923-24.  In *Zuckerman*,

*Blake*, and *White*, the exclusions excluded either "suicide or any attempt thereat" or "suicide,

while sane or insane."  See Zuckerman, 42 Cal.2d at 467; Blake, 99 Cal.App.3d at 905; White,

198 Cal.App.2d at 372. The exclusion in this case is for "suicide, or any attempt thereat, while

sane."  In light of *Zuckerman* and its reaffirmation and explanation in *Clemmer*, since the Policy's

suicide exclusion acts to further define coverage, the Policy in this case provides coverage for

suicide while insane.  However, Parker, not FSI, would have the burden of establishing insanity

since suicide while insane is a covered loss.[20]  See Aydin, 18 Cal.4th at 1188; Clemmer, 22 Cal.3d

at 880; Zuckerman, 42 Cal.2d at 472-74.  Thus, to establish a breach of contract, Parker must

show initially that Decedent's death fits within the coverage, meaning she must show an

accidental death either by disproving suicide or proving Decedent committed suicide while insane.

---

[20]Plaintiffs cite *Searle v. Allstate Life Ins. Co.*, 38 Cal.3d 425 (1985) in support of their argument that FSI has the burden of establishing the exclusion and thus, showing that Decedent committed suicide while sane. However, *Searle* involved a general life insurance policy, it did not involve an accidental death policy like the Policy in this case.  See Searle, 38 Cal.3d at 429-30.  This distinction, as emphasized by *Zuckerman*, is critical and dispositive.  See Zuckerman, 42 Cal.2d at 474.

### a.      Non-Suicidal Death

The evidence convincingly shows suicide.  First, Parker herself believed that the Decedent was attempting to commit suicide because she told the 911 operator, "My husband is trying to commit suicide."  See McNamara Declaration Exhibit A at 14-15.  Further, the 911 call indicates that Parker had some idea of a suicidal tendency by Decedent when, in response to whether other weapons were in the house, Parker stated, "They're locked up.  And I made sure of that a long – a few days ago.  Not a long time ago."  Id. at 19.  Second, Decedent told the paramedics that he had been drinking beer and whiskey and had taken approximately 15 pills,[21] and said that he just wanted to go to sleep and not wake up.[22]  See DUMF No. 19.  This is consistent with what Parker told the 911 operator, in response to how he was committing suicide, that Decedent had "taken a bunch of pills."  See McNamara Declaration Exhibit A at 14-15.  Third, the note found on the Decedent indicates suicide.  The note read, "No services.  Sandy knows where I want my ashes." Parker Deposition at 31:17-18.[23]  The note was written on the back of a lost child flyer from the mail, see id. at 32:1-6, and Parker points to no evidence that could explain why Decedent wrote such a note.  Fourth, the medical records suggest that Decedent committed suicide.  See Warren Exhibit I at 45-47; see also Warren Exhibit I at 40.  Finally, although asked to rule out an overdose, the Stanislaus County Coroner concluded that Decedent committed suicide.  See Warren Exhibit N.  The Coroner's conclusion of suicide remained even after Parker's attorney provided Dr. Boggs's report and requested that the cause be changed to accidental death.  See DUMF Nos. 16-17.

The only evidence that Parker identifies to show no suicide is the report of Dr. Boggs and

---

[21]Parker objects to this aspect of the coroner's report as being hearsay.  This statement by Decedent is excepted from the hearsay rule as a statement for the purposes of medical diagnosis or treatment under Rule of Evidence 803(4).

[22]Parker objects to this aspect of the coroner's report as being hearsay.  This statement by Decedent is excepted from the hearsay rule as a statement of existing mental, emotional, or physical condition under Rule of Evidence 803(3).

[23]To the extent that Parker suggests that no such note exists because the note has ever been produced, such an argument is disingenuous.  Parker's own testimony shows both the content and existence of the note.

her own count of Decedent's remaining pills, the results of which are incorporated into Dr. Boggs's report.  Dr. Boggs indicates that the level of Darvocet detected by the toxicology report was within the range of therapeutic use, that the level of Paxil was at the lower range of what might be toxic (although it is not clear whether the level of Paxil detected by the toxicology test was .11 or .14 mg/l and Dr. Boggs indicates that .10 mg/l is the bottom end of potentially toxic), that the level of Xanax was just over the upper therapeutic range and was inconsistent with a person who had taken 22 tablets, and that the alcohol level was consistent with someone who was a chronic drinker.  See Boggs Report at 59-60.  As the Court continues to understand Dr. Boggs's report, Dr. Boggs concludes that the death was accidental because each of the component parts of the substances ingested (alcohol, Darvocet, Paxil, and Xanax) were individually not overly toxic, as reflected in the toxicology report.  Because the individual parts were not overly toxic, and because the number of tablets remaining were more than if Decedent had been regularly taking his medication, such evidence suggests that Decedent did not intentionally overdose and was not attempting to commit suicide by overdosing.

However, although Dr. Boggs states that the toxicology levels are inconsistent with ingestion of 28 or more tablets, he does not state what number of tablets are consistent with the toxicology levels.[24]  The 28 tablet figure appears to be ultimately based on the "Prehospital Report" which stated that the Decedent "possibly" ingested 6 Darvocet and 22 Xanax.  See Warren Exhbit I at 38-39.  The Coroner's supplemental report, which is dated April 30, 2004, indicates that Decedent had said that he had ingested about 15 pills.  See DUMF No. 19.  Dr. Boggs never addresses Decedent's purported statements to the paramedics that he did not want to wake up.  Significantly, although Dr. Boggs acknowledges Decedent's severe depression and the discovery of a suicide note, he nowhere discusses their significance or how those factors should be considered.[25]  Dr. Boggs's opinion appears to boil down to the Decedent did not commit

---

[24]The toxicology report is not attached to Dr. Boggs's report.

[25]The Court notes that Dr. Boggs's report does not address Parker's statements to the 911 operator, but it is likely that Dr. Boggs did not have the transcript at the time of his report.

suicide because the toxicology levels are inconsistent with taking 28 pills and the large number of

remaining pills in the bottles.  However, whether someone takes large numbers of multiple

medications or slightly more than that which is prescribed is not material if the intent is to commit

suicide or to "not wake up again."  The toxicology levels in no way address or explain Decedent's

severe depression, refusal of treatment such that a sheriff deputy had to become involved, the

statement that Decedent did not want to wake up again, and the discovery of a note that indicates

suicide.[26]  Further, discussion of the pills remaining after Decedent was taken to the hospital is of

limited assistance since Decedent regularly took too much or too little of his medications and it

was difficult to keep him on his prescribed levels of medication.  See DUMF No. 14.  Stated

differently, Dr. Boggs's report does not sufficiently refute the conclusion that the Decedent

committed suicide.  As Dr. Boggs's opinion currently stands,[27] at best, it creates a "merely

colorable" issue of fact, it does not create a genuine material issue for trial.  See Anderson, 477

U.S. at 249-50; Hardage, 427 F.3d at 1187.

As for medical malpractice, assuming that death by medical malpractice falls within the

Policy's coverage, the burden would rest on Parker to show medical malpractice.  Cf. Aydin, 18

Cal.4th at 1188; Zuckerman, 42 Cal.2d at 472-74.  In California, "expert testimony is required to

prove or disprove that the [healthcare provider] performed in accordance with the standard

prevailing of care unless the negligence is obvious to a layperson."  Johnson v. Superior Court,

143 Cal.App.4th 297, 305 (2006).  Here, that multiple attempts and eventually the assistance of an

anesthesiologist were required to intubate Decedent is not in and of itself obviously negligent and

Parker has presented no expert evidence regarding malpractice.  In fact, Dr. Boggs states that

death was due to the combination/interaction of Xanax, Darvocet, and alcohol.  Dr. Boggs

purports to be an emergency room physician, but does not mention any negligence in the

intubation process or in Decedent's care in general.

[26]Further, there is no indication that the Coroner changed his conclusion of "suicide" even after reviewing Dr. Boggs's report/opinion nor does the report address Parker's perception of the event as embodied in the 911 call.

[27]The Court assumes that Dr. Boggs would give the same opinion under oath, since the report before the Court is not sworn and was prepared for the Coroner and/or FSI to review.

Dr. Yang's testimony also does not show malpractice.  First, Dr. Yang is an anesthesiologist and his deposition does not show how he is qualified to set the standard of care for emergency room physicians.  Second, Dr. Yang stated that he did not know if the emergency room personnel sent the tube through Decedent's air way or through his esophagus.  See Yang Deposition at 21:6-12.  Third, Dr. Yang indicated that the cause of Decedent's hard abdomen could have been the result of either improper intubation or the combination of drugs ingested.  See id. at 14:22-15:3.  Fourth, Dr. Yang indicates that Decedent's oxygen levels were in the "upper 90's" and that a Combitube was in place when he arrived.  See id. at 11:9-15.  Dr. Yang does not testify that the oxygen levels were too low, that the Combitube[28] had been improperly placed or utilized, or that the Decedent had been harmed by any conduct of the emergency room staff.  Parker states that Decedent was brain dead before Yang inserted the endotracheal tube, but does not cite to any specific place in the medical records for this assertion.  In the Court's review of the medical records, the only place that the term "brain dead" appears is in a memo by the Decedent's family physician and the memo seems to indicate that the Decedent was determined to be brain dead after his abdominal surgery, which was after Decedent was intubated by Yang.  See Warren Exhibit I at 48-50.

Some aspects of medical records require expert testimony to interpret or explain, while other aspects do not.  Parker makes general references to the medical records and cites to particular excerpts from Dr. Yang's deposition.  What Parker does not do is present testimony from a qualified physician who can explain the critical aspects of the medical records, set the standard of care, and render an opinion as to whether mistakes, accidents, or malpractice occurred.

---

[28]According to the Merck Manual, a Combitube is a "double-lumen esophageal/tracheal air-way device with proximal and distal balloons [that] may be used to occlude the pharynx and esophagus."  Merck Manual at 527 (18th Ed. 2006).  The Merck Manual further explains, "It is inserted blindly, usually ending up in the esophagus, in which case ventilation is accomplished through one lumen.  If it passes into the trachea, the patient is ventilated via the other lumen.  Thus, insertion technique is easy to master, and the device is helpful for minimally trained rescuers. The device is not satisfactory for prolonged use and should be changed for an endotracheal tube as soon as practical. Use is limited to prehospital cases where endotraceal intubation is unavailable or in emergency department following failed intubation."  Id.  The Court does not know whether use of the Combitube was appropriate or whether medical malpractice/a medical accident in fact occurred.  The Court cites this passage of the Merk Manual to illustrate why expert medical testimony is necessary to establish medical malpractice/a "medical accident."

In the circumstances of this case, such testimony is necessary in order for Parker to show some form of medical accident or malpractice.  Parker has not met her burden of presenting evidence that shows death due to medical malpractice.  See Aydin, 18 Cal.4th at 1188; Zuckerman, 42 Cal.2d at 472-74.

**b.     Insanity**

Parker argues that Decedent's depression, Alzheimer's disease, and the utilization of California Welfare and Institution Code § 5150 indicate insanity.  The medical records indicate that Decedent suffered from "severe depression" and that he had "early Alzheimer's."  See Warren Exhibit I at 39.  However, there is no evidence whether severe depression can rise to the level of being characterized as "insanity," whether early Alzheimer's can rise to the level of being characterized as "insanity," or, critically, how these conditions actually affected Decedent.  The only evidence before the Court is that Decedent had these conditions, but evidence of how they actually affected Decedent or if they had the effect of rendering Decedent "insane" is completely absent.

Similarly, the fact that Decedent was involuntarily taken to the hospital through the authority of 5150[29] tells the Court very little.  Medical personnel and the Sheriff Deputy responded to the 911 call, which was based on Parker's report of an attempted suicide.  See McNamara Declaration Exhibit A at 14, 23.  The Decedent said that he had taken about 15 pills and had been drinking.  Further, the medical personnel and the deputy viewed the note regarding cremation as a

---

[29]California Welfare and Institutions Code § 5150 reads in its entirety:

When any person, as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled, a peace officer, member of the attending staff, as defined by regulation, of an evaluation facility designated by the county, designated members of a mobile crisis team provided by Section 5651.7, or other professional person designated by the county may, upon probable cause, take, or cause to be taken, the person into custody and place him or her in a facility designated by the county and approved by the State Department of Mental Health as a facility for 72-hour treatment and evaluation.

Such facility shall require an application in writing stating the circumstances under which the person's condition was called to the attention of the officer, member of the attending staff, or professional person, and stating that the officer, member of the attending staff, or professional person has probable cause to believe that the person is, as a result of mental disorder, a danger to others, or to himself or herself, or gravely disabled. If the probable cause is based on the statement of a person other than the officer, member of the attending staff, or professional person, such person shall be liable in a civil action for intentionally giving a statement which he or she knows to be false.

suicide note.  See Warren Exhibit I at 38; Warren Exhibit P.  Given Decedent's unwillingness to

cooperate and the 911 call regarding an apparent suicide attempt, it is understandable that the

deputy took measures to get Decedent medical treatment.  However, there is no direct evidence of

why the deputy issued a 5150 hold or how Decedent's conduct was perceived by the deputy.

Section 5150 allows an officer to place a person into custody who is a danger to themselves or

others due to a "mental disorder."  A mental disorder is not necessarily synonymous with insanity

and there is no evidence regarding this deputy's background or expertise regarding mental

disorders or insanity.  There is no evidence that the deputy believed that Decedent was insane or

that the deputy was qualified to make such a determination.

The evidence before the Court does not support an inference of insanity.  The only

evidence before the Court is that Decedent had severe depression, early Alzheimer's, and that a

§ 5150 hold was utilized by a Deputy Sheriff.  There is no evidence of how the depression or

Alzheimer's actually affected Decedent or if these conditions could render him insane.  There are

no physician or psychiatric assessments nor is there even anecdotal evidence that shows how

Decedent behaved prior to his death.  Parker seems to rely only on the general perception of

Alzheimer's.  The same is true of severe depression.  As for § 5150, that section is premised on

persons with mental disorders and not necessarily persons who are insane, there is no evidence

regarding how the deputy perceived Decedent's conduct, there is no evidence of what

qualifications the deputy had, and the evidence tends to suggest that  § 5150 was utilized because

Decedent was attempting suicide and refusing medical aide.  At best, this evidence creates a

"merely colorable" issue of fact, it does not create a genuine material issue for trial.  See

Anderson, 477 U.S. at 249-50; Hardage, 427 F.3d at 1187.

**2.      BAD FAITH CLAIM**

*Defendant's Argument*

FSI argues that, since there was no breach of contract, there was no breach of the duty of

1    good faith and fair dealing.  Further, even if there is a genuine disputed issue of material fact

2    regarding  breach of contract, given the medical records, coroner report, and death certificate, FSI

3    acted reasonably.

4            *Plaintiff's Argument*

5            Parker argues that the evidence shows a breach of contract and that an inadequate

6    investigation was conducted.

7            *Discussion*

8            FSI is correct in both of its arguments.  As discussed above, the evidence presented by FSI

9    indicates suicide and Parker has not met her burden of presenting evidence that could reasonably

10   show either no suicide or suicide while insane.  When there is no breach of the insurance policy, a

11   claim for the breach of the duty of good faith and fair dealing, i.e. bad faith, will necessarily fail.

12   See Waller v. Truck Ins. Exch., 11 Cal.4th 1, 36-37 (1995); Cheviot Vista Homeowners Assn. v.

13   State Farm Fire & Casualty Co., 143 Cal.App.4th 1486, 1497 (2006).

14           Alternatively, there was clearly a genuine dispute between Parker and FSI.  "[A]s long as

15   the insurer's coverage decision was reasonable, it will have no liability for breach of the covenant

16   of good faith and fair dealing."  Morris v. Paul Revere Life Insurance Co., 109 Cal.App.4th 966,

17   973 (2003). The withholding of benefits due under the policy is not unreasonable if there is a

18   genuine dispute between the insurer and the insured as to coverage or the amount of payment due.

19   Jordan v. Allstate Ins. Co., 148 Cal.App.4th 1062, 1072 (2007); Chateau Chamberay

20   Homeowners Assn. v. Associated Internat. Ins. Co., 90 Cal.App.4th 335, 349 (2001).  As

21   discussed above, the medical records and death certificate indicate that Decedent's death was a

22   suicide and the Coroner's report indicates that the Decedent left a suicide note, said that he had

23   taken multiple pills, and did not want to wake up again.  In contrast, Parker presented only the

24   report of Dr. Boggs to FSI.  There is no evidence that indicates FSI conducted a biased or

25   insufficient investigation.  Cf. Chateau Chamberay, 90 Cal.App.4th at 348-49.   Summary

26   judgment on this claim is alternatively appropriate under the genuine dispute doctrine.  See

27   Jordan, 148 Cal.App.4th at 1072; Chateau Chamberay, 90 Cal.App.4th at 349.

28

1

2                                    **CONCLUSION**

3         FSI has moved for summary judgment on all claims.  FSI argues that Decedent committed

4  suicide, that Parker cannot show that her claim fits within the Policy's coverage, and that it did

5  not breach its duty of good faith and fair dealing.  Parker has the burden of showing that her claim

6  fits within the Policy's coverage, which means that Parker must show that Decedent's death was

7  accidental.  She can accomplish this by showing either that Decedent did not commit suicide or

8  that he committed suicide while insane.  The evidence, however, indicates that Decedent

9  committed suicide and there is insufficient evidence to support an inference of insanity.  At best,

10  Parker's evidence raises "merely colorable" issues of insanity and non-suicide.  Further, because

11  the evidence shows that FSI did not breach the insurance contract, there is no bad faith liability.

12  Alternatively, the evidence shows that there was a good faith dispute between Parker and FSI.

13  Therefore, summary judgment on Parker's breach of contract claim and bad faith claim is

14  appropriate.

15

16         Accordingly, IT IS HEREBY ORDERED that:

17  1.      Defendant's motion for summary judgment is GRANTED;

18  2.      The clerk is directed to enter judgment in favor of Defendant; and

19  3.      The clerk is directed to close this case.

20

21  IT IS SO ORDERED.

22  **Dated:    September 11, 2007                    /s/ Anthony W. Ishii**
                                              UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28